FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
MARCH 28, 2024

*Gonzáles, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
MARCH 28, 2024

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 101502-0 |
| Petitioner, | |
| v. | En Banc |
| JOHN RAY STEARNS, | |
| Respondent. | Filed: March 28, 2024 |

STEPHENS, J.—A person charged with a crime has a due process right to be prosecuted in a timely manner so they may meet the charges against them. While deciding what is "timely" involves policy questions left to the legislature in setting statutes of limitation and to the executive in exercising prosecutorial discretion, courts play an important role in determining when an instance of prosecutorial delay violates fundamental concepts of justice and requires dismissal of the charges. This case requires us to examine the framework for balancing the relevant considerations and making such a determination.

In 2004, the State matched DNA samples from a homicide victim, Crystal Williams, to John Stearns. The State acknowledges it had probable cause to charge Stearns as early as 2005, but charges were not filed until 2017, apparently due to a misplaced homicide file. Stearns moved to dismiss, arguing that the State's 12-year preaccusatorial delay violated his due process rights. Specifically, he claimed the delay prejudiced his defense because a key witness who died before trial would have testified that she saw the victim with someone other than Stearns in the hours before her death. The trial court denied the motion, and a jury convicted Stearns of first degree murder. The Court of Appeals reversed his conviction, concluding that the State's charging delay was negligent and that the loss of key witness testimony violated Stearns's due process rights.

We reverse. Though the State was negligent in failing to bring charges sooner, the resulting loss of a witness's testimony did not, on balance, amount to a denial of due process. The due process inquiry is necessarily fact intensive, and Stearns has not demonstrated that the prejudice he suffered from the loss of the witness's potential testimony was sufficient to justify the dismissal of this serious murder case.

## FACTS AND PROCEDURAL HISTORY

In January 1998, Crystal Williams was found dead in a park in Seattle's Central District. Park employees found her body between 10:00 a.m. and 11:00 a.m., her clothes partially removed. She had blunt force injuries to her face and skull, and

a used condom was found beside her body. Law enforcement concluded that she had died of a sexually motivated homicide.

Witnesses identified a man they saw walking away with Williams in the early morning. These witnesses included companions of Williams who, like her, experienced addiction and engaged in sex work for drugs or the money to purchase them: Lisa Warner, Taffy Gober, and Yvonne Hicks, Williams's half sister. Law enforcement officers investigating Williams's death wrote in their report that Hicks said she was present when Williams and a man walked away together at 6:30 a.m. toward a nearby park. Gober reported that she saw Williams walk away with a man at 4:00 a.m. She recognized him because they had taken drugs together a few hours earlier. Based on Gober's description, Jimmy Horner was arrested. But, after exculpatory DNA test results were obtained from a cheek swab of Horner, the State excluded him as a suspect.

In 2004, the Washington State Patrol (WSP) Crime Laboratory detected a DNA match from samples collected from Williams's body and the condom found nearby. The DNA match pointed to John Stearns, who was then serving a 720-month prison sentence for previous sexual assault and rape convictions. In an interview with homicide detectives in 2005, Stearns denied having ever met Williams or the other witnesses. Regardless, based on Stearns's past convictions and the DNA match, the State agrees it had probable cause to charge Stearns at that time. The

State did not charge Stearns until 2017, after a detective moved into a new office "filled with case files" and came across Williams's file. Verbatim Report of Proceedings (VRP) (Jan. 14, 2020) at 63. A few months later, witness Hicks died.

Stearns moved to dismiss the murder charges against him based on preaccusatorial delay in violation of his due process rights. He argued the State was negligent in failing to charge him sooner and its charging delay prejudiced him because a key witness, Hicks, had died and could no longer testify. Stearns's defense theory was that the police incorrectly assumed that "the person whose DNA was in the condom was the person that killed [Williams]." VRP (Feb. 3, 2020) at 1065. Stearns argued he had consensual sex with Williams, which is why his DNA was found in the condom, but it must have been Horner who later killed her. Had Hicks been able to testify, Stearns argued, she would have corroborated Gober's testimony that it was Horner, not Stearns, last seen with Williams.

At a pretrial hearing, the law enforcement officers investigating Williams's murder and the prosecutor assigned to the case confirmed that between 2005 and 2017, they took no additional steps to investigate Williams's murder. Still, the prosecutor claimed that he worked with homicide detectives on the case "fairly continually until [Stearns] was charged," looking at Stearns's past criminal history and "whether the witnesses were around." VRP (Jan. 22, 2020) at 346. The prosecutor said it took him "a long time to actually come to see sort of the scope of

4

[Stearns's] behavior," specifically Stearns's "series of attacks on women." *Id.* at 347.

The prosecutor also testified that his office did not prioritize Stearns's case because they had "more pressing things to do." *Id.* at 349. He remembered responding to a detective's follow-up about this case and "saying something to the effect like I'm drowning" because of the workload, and he sought to balance the State's "limited resources and limited time . . . with the interest of protecting the community." *Id.* at 344-45. He reasoned that Stearns was "no danger to anyone" because Stearns "would be in custody for the rest of his life, and if not for the rest of his life, at least until . . . an advanced age." *Id.* at 345. He testified the charging delay was not intended to prejudice Stearns's ability to defend in his case.

The trial court denied Stearns's motion to dismiss, and the case proceeded to trial in January 2020. That trial resulted in a hung jury, and the court declared a mistrial. The case was retried in November 2020 with largely the same witnesses.

At the second trial, Taffy Gober and Lisa Warner testified on behalf of the State. Gober said she last saw Williams with a man other than Stearns at either 2:00 a.m. or 3:00 a.m. She estimated the time based on "trying to count the hours until [she] could buy alcohol." VRP (Nov. 2, 2020) at 1563. Gober stated that her earlier police interview after Williams died was not entirely accurate. *See id.* at

1561-63 ("the things that I told [law enforcement] were true with [the] exception of a few things"). She said she was high at the time.

Warner testified she was with Gober and a "couple other girls" when Williams walked away with the man. VRP (Nov. 3, 2020) at 1730. She said she last saw Williams before 2:00 a.m., recalling the last call for alcohol at the nearby convenience store. *Id.* at 1737. When Williams did not return after "15 or 20 minutes," Warner went to the park to look for her but saw nobody there. *Id.* She was concerned because she thought she heard Williams calling for her, but the others told her she was high.

Park employees found Williams's body between 10:00 a.m. and 11:00 a.m. The medical examiner testified that although he was unable to determine the exact time of death, Williams's low body temperature meant she had "been there dead for several hours." VRP (Nov. 9, 2020) at 2264-65. Her body had "multiple contusions, abrasions, [and] lacerations," signs of blunt force trauma to the head, as well as evidence of asphyxiation and strangulation. *Id.* at 2269. Law enforcement collected DNA evidence from Williams's body and clothes, as well as from a used condom found near her body.

The State presented evidence of the DNA match between Stearns and samples from the condom, Williams's vaginal swabs, and Williams's clothes. A forensic scientist from the WSP Crime Laboratory testified that the majority of the male DNA

collected from the samples matched that of Stearns, whereas trace amounts pointed to other individuals. She testified to the high accuracy of the match between Stearns and the sample from the used condom and the vaginal samples from Williams. When asked if the samples were consistent with the conclusion that the victim did not get up or move around after intercourse, she replied that the amount of DNA found on Williams's vaginal swabs was higher than in typical sexual assault cases because "after a normal course of activity . . . some of the DNA will have drained out of the vaginal area." VRP (Nov. 5, 2020) at 2130. She could not confirm who the last person to contribute to the DNA samples was. *Id.* at 2150.

Two prior victims of Stearns's testified that Stearns had violently attacked and choked them in a manner consistent with the injuries found on Williams's body. Stearns had attacked both victims in the Central District. Stearns stipulated to the convictions arising from both attacks: rape in the second degree and attempted rape in the second degree. The trial court admitted the evidence for the limited purpose of establishing a common scheme or plan based on Stearns's prior conduct and to establish forcible compulsion with respect to Stearns's charges.

A jury convicted Stearns as charged and he appealed. Stearns argued, among other things, that the trial court erroneously denied his motion to dismiss for improper preaccusatorial delay. Division One agreed with Stearns on the due

7

process violation, reversing and dismissing Stearns's case with prejudice. The court did not reach his other assignments of error.

We granted the State's petition for review and amicus curiae briefing from the Washington Association of Criminal Defense Lawyers.

ANALYSIS

Generally, the question of how long the State may wait before bringing criminal charges against a person is a policy decision entrusted to the legislature as well as the executive branch prosecuting authority. Statutes of limitation reflect "legislative assessments of relative interests of the State and the defendant in administering and receiving justice," serving as the "'primary guarantee against bringing overly stale criminal charges.'" *United States v. Marion*, 404 U.S. 307, 322, 92 S. Ct. 455, 30 L. Ed. 2d 468 (1971) (quoting *United States v. Ewell*, 383 U.S. 116, 122, 86 S. Ct. 773, 15 L. Ed. 2d 627 (1966)). Within those prescribed periods, prosecutors have substantial discretion in determining when and how to bring criminal charges. *See, e.g.*, *State v. Lewis*, 115 Wn.2d 294, 299, 797 P.2d 1141 (1990) ("It is a long-recognized principle that prosecutors are vested with wide discretion in determining how and when to file criminal charges."). However, due process also plays a "limited role" in protecting against lengthy charging delays. *United States v. Lovasco*, 431 U.S. 783, 789, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977).

The due process clause of the Fifth Amendment protects against the deprivation of "life, liberty, or property, without due process of law." U.S. CONST. amend. V. Due process preserves a defendant's "ability to present an effective defense." *Marion*, 404 U.S. at 320.

The United States Supreme Court held for the first time in *Marion* that preaccusatorial delays could violate due process, requiring dismissal of the prosecution. *Id.* at 324. *Marion* concerned delays that were intentional and designed "to gain some tactical advantage over" the accused or "to harass them." *Id.* at 325. In a concurring in the result opinion, Justice Douglas recognized that "'[t]he same may be true of any governmental delay that is unnecessary, whether intentional or negligent in origin.'" *Id.* at 334 (quoting *Dickey v. Florida*, 398 U.S. 30, 51, 90 S. Ct. 1564, 26 L. Ed. 2d 26 (1970) (Brennan, J., concurring)). A few years later, in *Lovasco*, the Court clarified that investigative delay is "fundamentally unlike" intentional delay, holding that prosecution after an 18-month investigative delay did not violate due process. 431 U.S. at 795-96. *Lovasco* "[left] to the lower courts . . . the task of applying the . . . principles of due process . . . to the particular circumstances of individual cases." *Id.* at 797.

We have developed a three-part test to analyze when a due process violation arises from intentional preaccusatorial delay. *State v. Calderon*, 102 Wn.2d 348, 353-54, 684 P.2d 1293 (1984). In *State v. Oppelt*, we applied the test for the first

9

time in the context of negligent preaccusatorial delay: "(1) the defendant must show actual prejudice from the delay; (2) if the defendant shows prejudice, the court must determine the reasons for the delay; (3) the court must then weigh the reasons and the prejudice to determine whether fundamental conceptions of justice would be violated by allowing prosecution." 172 Wn.2d 285, 295, 257 P.3d 653 (2011). While our precedent recognizes that negligent preaccusatorial delay may violate due process, this requires a showing of "greater prejudice to the defendant than cases of intentional bad faith delay." *Id.* at 296.

We review de novo "[w]hether due process rights are violated by a preaccusatorial delay." *Id.* at 290 (citing *State v. Salavea*, 151 Wn.2d 133, 138-39, 86 P.3d 125 (2004)). This means we "examine the entire record to determine prejudice and to balance the delay against prejudice." *Id.*

I. The State's charging delay prejudiced Stearns because he lost witness testimony

Preaccusatorial delay may violate a defendant's due process rights when the defendant experiences "actual prejudice" that contradicts the "'fundamental conceptions of justice which lie at the base of our civil and political institutions.'" *Lovasco*, 431 U.S. at 790 (quoting *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S. Ct. 340, 79 L. Ed. 791 (1935)). "Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay." *Marion*. 404 U.S. at 324. But "no one suggests that every delay-caused detriment to a defendant's case should

abort a criminal prosecution." *Id.* at 324-25. Instead, there must be actual prejudice based on the circumstances of each case. *Id.* at 324.

Determining prejudice is necessarily a fact-intensive analysis. In the context of juvenile jurisdiction, we have held that prejudice exists when preaccusatorial delay "results in a decrease of benefits available to a defendant." *Salavea*, 151 Wn.2d at 139. In *Salavea*, though the defendant committed several offenses as a juvenile, he was not charged until years later as an adult. *Id.* at 136-37. He claimed this preaccusatorial delay resulted in the loss of juvenile jurisdiction, thereby prejudicing his defense. *Id.* at 136. Because of "the nature of the charges and [his] age at the earliest possible time of charging," we held he was "never entitled to juvenile court jurisdiction" and his prejudice claim failed. *Id.* at 136, 147.

In contrast, in *Oppelt*, we concluded the defendant experienced actual prejudice when a witness no longer remembered specific details after a charging delay by the State. 172 Wn.2d at 296. The defendant there was charged with sexually assaulting his stepdaughter. *Id.* at 287. After the "last incident of abuse," the victim's great-grandmother "gave her some lotion to apply to her vagina." *Id.* A nurse later "observed redness and swelling of the genitalia." *Id.* Six years later, the great-grandmother could no longer "'recall the type of lotion used and who applied it to the victim's genital area.'" *Id.* at 296 (quoting court papers). The defendant argued he was precluded from arguing that it was the lotion, and not his

actions, that caused the redness in the victim's genital area. *Id.* We acknowledged the "loss of testimony about the exact lotion used [was] very slight prejudice" to the defense. *Id.*

Stearns argues the State's 12-year charging delay caused him actual prejudice because Hicks was a key witness and she died shortly after charges were filed in 2017. Stearns points out that "Hicks was one of the last people to see . . . Williams alive." Suppl. Br. of Resp't at 8. Based on her statements to police, Stearns argues Hicks would have testified that she saw Williams alive around 6:30 a.m., and this would have corroborated Gober's police statements identifying Horner as the last person with Williams. *Id.* (stating Hicks's "testimony would have both shortened the timeframe in which the murder could have occurred and established . . . Williams walked towards the park shortly before her death with someone who did not match . . . Stearns'[s] physical description."). Stearns further argues Hicks's testimony would have directly supported his defense theory that he and Williams had consensual sex earlier that night, but it was another man, Horner, "who did not match . . . Stearns'[s] description," who killed Williams. *Id.* at 16-17.

Stearns is correct that had the State brought charges sooner, Hicks would have likely been able to testify. As in *Oppelt*, the loss of her testimony caused some actual prejudice to Stearns. We set aside for a moment any assessment of the extent of

prejudice, as our due process test first requires consideration of the reasons for the State's preaccusatorial delay.

II. The State's 12-year charging delay was unreasonable and reflects negligence rather than intent to gain a tactical advantage

Courts refrain from "attempting to monitor the daily activities and decisions of a prosecutor's office." *State v. Cantrell*, 111 Wn.2d 385, 391, 758 P.2d 1 (1988). Our role is to safeguard important constitutional and statutory rights, and we review due process claims recognizing that "broad prosecutorial discretion" may reasonably justify unintentional charging delays in some circumstances. *Calderon*, 102 Wn.2d at 353-54. For example, investigative or administrative delays may be reasonable under the circumstances of a particular case. *See State v. Lidge*, 111 Wn.2d 845, 850, 765 P.2d 1292 (1989) (due to limited prosecutorial resources, the State's decision to not expedite filing charges against a juvenile defendant was justified). *See also State v. Alvin*, 109 Wn.2d 602, 603, 607, 746 P.2d 807 (1987) (a charging delay caused by an investigating detective's training and vacation schedule was reasonable).

On the other hand, intentional delays intended to gain a tactical advantage are appropriately reviewed with greater scrutiny. *See, e.g.*, *Marion*, 404 U.S. at 324. Importantly, here, the parties agree that the State's charging delay was not intended to gain a tactical advantage in Stearns's case. It appears the investigation stalled and

13

the file was misplaced for several years.  In its briefing below, the State attempted to justify its actions, but at oral argument, it conceded the delay was inexcusable and amounted to negligence.  Wash. Sup. Ct. oral arg. *State v. Stearns*, No. 101502-0 (Oct. 10, 2023) at 1 min., 30 sec., *video recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org.  We accept this concession, though we disagree with the Court of Appeals' view that the unreasonable delay resulted in a due process violation.

The Court of Appeals' decision unnecessarily calls into question prosecutorial discretion in deciding when to file charges, concluding in part that the State was negligent because it had no *investigative purpose* for the charging delay.  *State v. Stearns*, 23 Wn. App. 2d 580, 591-92, 517 P.3d 467 (2022).  Emphasizing that the State had probable cause to prosecute Stearns as early as 2005, the court suggests that with "no need for additional evidence" or "any other substantial investigation," the negligent delay by the State provides sufficient grounds for dismissing the prosecution.  *Id.*

The State correctly observes that the Court of Appeals opinion "overstates the importance of a probable cause determination vis-à-vis a filing decision," "skew[ing] the actual standard."  Suppl. Br. of Pet'r at 29-30.  Of course, the State must have probable cause to charge a defendant.  *See, e.g.*, *Lovasco*, 431 U.S. at 791. However, "prosecutors are under no duty to file charges as soon as probable cause

exists," nor are they required to file once there is "sufficient evidence to prove guilt beyond a reasonable doubt." *Id.* at 791-92. "[N]o one's interests would be well served by compelling prosecutors to initiate prosecutions as soon as they are legally entitled to do so." *Id.* at 792.

Probable cause is not the benchmark for measuring unreasonable delay; what matters is that the State demonstrates a reasonable justification for the time it takes to file charges. *Oppelt*, 172 Wn.2d at 292 ("'the court must consider the reasons for the [preaccusatorial] delay'" (quoting *Calderon*, 102 Wn.2d at 352)). Whether that delay is for investigative or administrative reasons, there may be justifiable reasons for not filing a case at the moment when probable cause is established. Moreover, even where the delay in bringing charges is not excusable, as here, the State's negligence is not itself sufficient grounds for dismissal. Instead, under the third part of our due process test, courts must carefully weigh the prejudice the defendant suffered from the delay against the broader interests of justice. *Id*. at 295. Applying that test, we conclude that Stearns is not entitled to dismissal of the charges against him.

III. <u>Though Stearns suffered some prejudice from the State's negligent delay, his prosecution does not violate fundamental conceptions of justice under the due process clause</u>

As explained in *Oppelt*, unjustified delay resulting from negligent conduct is not sufficient in itself to establish a due process violation; a greater showing of

prejudice is required than in cases of intentional delay. *Id*. at 296. Stearns must demonstrate that the prejudice he experienced is substantial enough to conclude that allowing the prosecution would violate "'fundamental conceptions of justice' . . . which define 'the community's sense of fair play and decency.'" *Id.* at 289 (internal quotation marks omitted) (quoting *Lovasco*, 431 U.S. at 790), 295. Dismissal of prosecution, especially in cases of negligent charging delay, is "'an extraordinary remedy.'" *State v. Chavez*, 111 Wn.2d 548, 562, 761 P.2d 607 (1988) (quoting *State v. Laureano*, 101 Wn.2d 745, 762, 682 P.2d 889 (1984), *overruled in part on other grounds by State v. Brown*, 113 Wn.2d 520, 782 P.2d 1013 (1989)).

This heightened standard reflects a split among jurisdictions about whether negligent, as opposed to intentional, delay amounts to a violation of the due process clause. *See, e.g.*, *United States v. Mays*, 549 F.2d 670, 678 (9th Cir. 1977) (recognizing negligent delay can violate due process); *cf. Commonwealth v. Scher*, 569 Pa. 284, 803 A.2d 1204 (2002) (negligent delay cannot violate due process). In *Oppelt*, we adopted the Ninth Circuit Court of Appeals' view, holding that negligent preaccusatorial delay can violate due process, but "requires greater prejudice to the defendant than cases of intentional bad faith delay." 172 Wn.2d at 292, 296 (citing *United States v. Moran*, 759 F.2d 777, 782 (9th Cir. 1985)).[1] Therefore, negligent

---

[1] In *Moran*, the Ninth Circuit concluded that "intent or reckless behavior by the government" was not an "essential ingredient" for actual prejudice. 759 F.2d at 782. However, "[i]f mere negligent conduct by the prosecutors is asserted, then obviously the

preaccusatorial delays weigh less heavily against the government in determining whether a due process violation occurred. *See Barker v. Wingo*, 407 U.S. 514, 531, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972) ("different weights should be assigned to different reasons").[2]

In *Oppelt*, the State's negligent preaccusatorial delay did not cause the defendant sufficient prejudice to justify dismissal of his case. 172 Wn.2d at 296. We concluded the loss of the great-grandmother's testimony about the lotion was "very slight prejudice" to the defense, not enough to meet the heightened standard in cases of negligent charging delays. *Id.* The defendant was "not precluded from arguing that the lotion *might* have caused redness and swelling, and no other memory issues were identified as specifically problematic." *Id.* Balancing the reasons for the delay with the prejudice faced by the defendant, we concluded that he had received a fair trial and that his due process claim was properly dismissed. *Id.*

As in *Oppelt*, Stearns had a basis in the available testimony to argue that another man was last seen with Williams and must have killed her following Stearns's sexual encounter with Williams. Taffy Gober testified, similar to Hicks's

---

delay and/or prejudice suffered by the defendant will have to be greater than that in cases where recklessness or intentional government conduct is alleged." *Id.*

[2] *Barker* involved a speedy trial claim, but the Court cited *Marion* in reasoning that more "neutral reason[s] [for delay] such as negligence or overcrowded courts should be weighted less heavily" against the government than delays made in "deliberate attempt . . . to hamper the defense." 407 U.S. at 531.

statement, that she saw Williams with another man, identified as Horner. While her estimate of the time frame differed from that in Hicks's statement, during her testimony Gober admitted to some uncertainty, and both witnesses referenced it being close in time to when they were able to buy alcohol at the local store. Of course, the certainty of the time frame in Hicks's statement was never subject to cross-examination, but even accepting as fact that Hicks saw Williams and a man enter the park around 6:30 a.m., such evidence is not dispositive to Stearns's defense. The State correctly observes that it would prove simply that Williams was with another man at 6:30 a.m., not that the man killed her then. Warner testified she went to look for Williams soon after Williams and the man walked away, but did not find her. While the medical examiner could not precisely determine Williams's time of death, he testified that her body temperature suggested the body had been there for hours. Given all the evidence, Williams could have been murdered after 6:30 a.m. when Hicks saw her enter the park with a man.

Additionally, the State presented strong DNA evidence pointing to Stearns, and his defense was that he had sex with Williams before she was killed. The forensic scientist from the WSP Crime Laboratory testified that the DNA samples from Williams's vaginal swabs were unusually high, suggesting she was not able to get up again after intercourse. The State also presented evidence of Stearns's prior violent, sexually motivated attacks on women in the Central District area, which

18

bore hallmarks suggesting a common plan or scheme of sexually motivated attacks. Stearns's prior victims testified that he choked them, and Williams's body showed signs of strangulation as well.

The strength of the evidence implicating Stearns suggests that Hicks's anticipated testimony would not have weighed as heavily as Stearns argues. Nor was he prevented from advancing his defense theory that the person last seen with Williams must have killed her, as other witnesses also testified to seeing Williams enter the park with a man in the hours before her body was found. *See Oppelt*, 172 Wn.2d at 296 (concluding that the defendant could receive a fair trial despite a witness's inability to recall specific details while testifying). Balancing the limited prejudice to Stearns from the unavailability of Hicks's testimony against the State's negligent delay in bringing charges, we hold that allowing the prosecution in this case did not violate "'fundamental conceptions of justice.'" *Lovasco*, 431 U.S. at 790 (quoting *Mooney*, 294 U.S. at 112).

                            CONCLUSION

We reverse the Court of Appeals. Balancing all relevant considerations, we conclude Stearns has not demonstrated a due process violation. As we held in *Oppelt*, when the "State's reason for delay is mere negligence, establishing a due process violation requires greater prejudice to the defendant than [in] cases of intentional bad faith delay." 172 Wn.2d at 296. While there is no dispute here that

the State negligently delayed in bringing charges against Stearns and that the 12-year preaccusatorial delay resulted in the loss of a witness's testimony, allowing the prosecution does not offend fundamental concepts of justice which define 'the community's sense of fair play and decency.'" *Id.* at 289 (internal quotation marks omitted) (quoting *Lovasco*, 431 U.S. at 790), 295.

Because the Court of Appeals declined to reach Stearns's additional assignments of error when it concluded Stearns's due process rights were violated, we remand to the Court of Appeals to address those issues.

_____
Stephens, J.

WE CONCUR:

_____
González, C.J.

_____
Johnson, J.

_____
Madsen, J.

_____
Owens, J.

_____
Gordon McCloud, J.

_____
Yu, J.

_____
Montoya-Lewis, J.

_____
Whitener, J.