IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>               Respondent,<br><br>        v.<br><br>JOHN RAY STEARNS,<br><br>               Appellant. | No. 82125-3-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, A.C.J. — After remand from the Supreme Court, this court considers additional issues presented in John Ray Stearns' appeal from his conviction for felony murder in the first degree, predicated on rape in the first and second degrees, with a special allegation of sexual motivation. He asserts that the trial court abused its discretion when it admitted improper propensity evidence in violation of ER 404(b). Stearns also alleges that prosecutorial misconduct and irregularities in the issuance of the court's instructions to the jury require reversal. Because the trial court erred when it admitted evidence of other acts under ER 404(b), we reverse.

## FACTS

The facts of Stearns' case were set out as follows in the opinion that issued in his previous appeal to this court:

> In January 1998, city park employees discovered Crystal Williams's body outside the bathrooms in Dr. Blanche Lavizzo Park in Seattle's Central District. Seattle Police Department (SPD)

officers retrieved a used condom from the ground near Williams's body and the Washington State Patrol Crime Laboratory [(WSP Crime Lab)] later determined it contained semen from the same source as the vaginal swab collected from Williams during her autopsy. At the time the biological samples were gathered and first examined, the DNA profile did not match anyone in the Combined DNA Index System (CODIS) and the police investigation continued. SPD detectives determined that on the morning of the murder, several women saw Williams in the hours before her death. Many of these women, like Williams, engaged in sex work to support their drug use, either trading sex for drugs directly or for cash to purchase them. Williams commonly spent time with this group of women in and around Lavizzo Park, where they often took their "dates" to the bathrooms to conduct their business. From this group, SPD detectives interviewed [five different women, including] Williams's half-sister. Several of the women were consistent in their statements that they last saw Williams walking away from where the group congregated near a corner store in the early morning hours and that she was heading toward the park with a man.

Detectives conducted these eyewitness interviews early in the investigation and, based on the resulting information, soon arrested and interviewed Jimmy Horner as a suspect. At the time of Horner's arrest, he matched multiple key aspects of the descriptions given by the women about the man last seen with Williams. [One of Williams' colleagues from the park who had been interviewed by SPD] also picked Horner out of a police photomontage. However, the police ceased their investigation into Horner after the WSP[ Crime Lab] determined his DNA did not match the recovered semen samples. Police also interviewed a number of other suspects but, eventually, the case went cold.

In 2004, the WSP [Crime Lab] notified SPD of a CODIS match to the Williams DNA samples. As a result, detectives interviewed Stearns in prison in March 2005. He was serving a 720-month prison sentence on an unrelated matter. During the interview, Stearns denied having sex with Williams or otherwise knowing her. Jeffery Baird, the deputy prosecuting attorney (DPA) handling the Williams case, later concluded that probable cause existed to charge Stearns for her murder at that time; however, he did not actually file charges until 2017. The record reflects that no meaningful investigation occurred after 2005.

On August 10, 2017, the State charged Stearns with one count of felony murder in the first degree with a special allegation that he committed the crime with sexual motivation.

*State v. Stearns*, 23 Wn. App. 2d 580, 582-84, 517 P.3d 467 (2022) (*Stearns* I) (footnote omitted), *reversed*, 2 Wn.3d 869, 545 P.3d 320 (2024). The State specifically asserted that Stearns committed the murder of Williams while committing or attempting to commit, and in furtherance or flight from rape in the first degree and rape in the second degree.

Stearns engaged in extensive pretrial litigation, including a motion to dismiss for improper preaccusatorial delay and, in response to a State motion to admit evidence under ER 404(b), to exclude evidence of other acts. The motion to dismiss was denied. Of the three offered and challenged, the State was permitted to introduce evidence of two prior sexual assaults for which Stearns had been convicted. Stearns proceeded to trial in January 2020, but the judge declared a mistrial after the jury could not reach a unanimous verdict. The State retried Stearns in November 2020.

> The witnesses [in the retrial] were largely the same as the first trial and primarily consisted of numerous law enforcement officers who had worked on the case; some had since retired and others were still with SPD. A number of expert witnesses testified about the DNA evidence that officers collected, its processing, the CODIS match, and the significance of the condition and location of the samples. Horner also testified briefly, as did two of the women who had seen Williams on the morning of her murder . . . . At the time of trial in 2020, three of the women who told police in 1998 that they were with Williams on the morning of her murder were deceased. Of those three unavailable witnesses, two of them indicated to police in 1998 that they recalled seeing Williams leaving the corner store with a man and provided a description of him. The jury found Stearns guilty as charged and the trial court sentenced him as a persistent offender to life in prison without the possibility of release.

*Stearns* I, 23 Wn. App. 2d at 584. This court reversed and remanded for dismissal with prejudice, holding that a 12-year delay in prosecution violated Stearns' right

to due process because several key witnesses had passed away by the time of trial, which prejudiced him. *Id.* at 594-95. Because that issue was independently dispositive, we did not decide Stearns' other assignments of error. *Id.* at 585.

Our Supreme Court granted the State's petition for review and considered solely the issue of preaccusatorial delay. *State v. Stearns*, 2 Wn.3d 869, 545 P.3d 320 (2024) (*Stearns* II). It held that Stearns had suffered actual prejudice, but that the State was merely negligent in its charging delay, a lower standard than intentional delay. *Id.* at 881, 883-84. Under that standard, the Supreme Court held that Stearns had failed to show actual prejudice such that "prosecution would violate 'fundamental conceptions of justice.'" *Id.* at 883 (internal quotation marks omitted) (quoting *State v. Oppelt*, 172 Wn.2d 285, 289, 257 P.3d 653 (2011)). It reversed and remanded for this court to consider Stearns' other assignments of error. *Id.* at 886.

ANALYSIS

I.      Admission of Other Acts under ER 404(b)

Stearns challenges the admission of evidence of his past convictions for rape in the second degree in 1981 and for rape in the second degree and robbery in the first degree in 1989. The trial court admitted testimony from the victims and documentation of the convictions under ER 404(b) as evidence of a plan, to prove an element of the crime charged in the case involving Williams, and to rebut the defense of consent.

A.     Other Crimes, Wrongs, or Acts

ER 404(b) allows for admission of "other crimes, wrongs, or acts" that would normally "not [be] admissible to prove the character of a person in order to show action in conformity therewith." The acts "may, however, be admissible for other purposes, such as proof of . . . [a] plan." ER 404(b). "ER 404(b) prohibits evidence of other crimes to show that the defendant acted in conformity with that character— i.e., had a propensity to commit this crime." *State v. Williams*, 156 Wn. App. 482, 490, 234 P.3d 1174 (2010).

This court reviews questions of law, such as the interpretation of evidentiary rules, de novo. *State v. Foxhoven,* 161 Wn.2d 168, 174, 163 P.3d 786 (2007). If the trial court has interpreted the rule correctly, we then review the admissibility ruling for abuse of discretion. *Id.* The trial court has abused its discretion if its decision "is manifestly unreasonable or exercised on untenable grounds or for untenable reasons." *State v. Hudson*, 150 Wn. App. 646, 652, 208 P.3d 1236 (2009).

"Washington courts have developed a thorough analytical structure for the admission of evidence of a person's prior crimes, wrongs, or acts." *State v. Gresham*, 173 Wn.2d 405, 421, 269 P.3d 207 (2012).

> To admit evidence of a person's prior misconduct, "the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect."

*Id*. (quoting *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)); *see also State v. Lough*, 125 Wn.2d 847, 853, 889 P.2d 487 (1995).

There are two instances in which evidence is admissible to prove a common scheme or plan: (1) "where several crimes constitute constituent parts of a plan in which each crime is but a piece of the larger plan" and (2) where "an individual devises a plan and uses it repeatedly to perpetrate separate but very similar crimes."

*Gresham*, 173 Wn.2d at 421 (quoting *Lough*, 125 Wn.2d at 854-55). "[T]he requirement [is] that 'the defendant committed markedly similar acts of misconduct against similar victims under similar circumstances.'" *State v. DeVincentis*, 150 Wn.2d 11, 19, 74 P.3d 119 (2003) (internal quotation marks omitted) (quoting *Lough*, 125 Wn.2d at 856). "[A]n intelligent weighing of potential prejudice against probative value is particularly important in sex cases, where the prejudice potential of prior acts is at its highest." *State v. Saltarelli*, 98 Wn.2d 358, 363, 655 P.2d 697 (1982); *see also State v. Gogo*, 29 Wn. App. 2d 107, 117, 540 P.3d 150 (2023).

Here, the State argued that Stearns has a history of striking victims on the head, strangling them to prevent resistance, and then raping them, and that Williams had also been a victim of this common plan. In 1982, Stearns was convicted of rape in the second degree after entry of an *Alford*[1] plea based on an incident that had occurred with victim B.G. the previous year (B.G. conviction). In 1989, Stearns was found guilty of attempted rape in the second degree and robbery in the first degree after trial. The victim in that case was D.H. (D.H. conviction). Finally, in 2000 Stearns pleaded guilty to assault in the third degree, burglary in the second degree, and theft in the first degree after an incident from the previous year that involved victim Y.C. (Y.C. conviction).

---

[1] *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

B. Pretrial Litigation and Ruling on Admissibility

Prior to the start of Stearns' first trial for Williams' murder, the State sought admission of certain of Stearns' past convictions and proffered testimonial and documentary evidence related to all three of these cases. The DPA characterized this evidence as "prior specific acts of the defendant as evidence that the defendant raped and murdered Crystal Williams as part of a commonly used plan to violently assault women in the head with blunt force as part of committing a rape." In fact, during the twelve-year delay between the development of probable cause to charge Stearns for Williams' murder and the actual filing of the instant case, the DPA originally assigned to the case, Baird, had consulted with the appellate unit of the prosecutor's office to determine whether this criminal history would be admissible in the trial on Williams' murder. The State denied that this was impermissible propensity evidence and instead asserted that it was "to show how [Stearns] had a well-defined design to violently, and sexually, assault women," that Stearns had acted under such a plan in the past, and utilized it again as to Williams. The DPA asserted that the evidence of the prior convictions was also offered to prove the elements of forcible compulsion and was, therefore, necessary to prove the predicate offenses underlying the murder charge. Finally, the State averred that the evidence was needed "to rebut any potential defense claim that the sexual encounter with Crystal Williams was consensual." The State's motion relied on a variety of documents: Stearns' plea and judgment and sentence (J&S) from the B.G. conviction, as well as B.G.'s statement to police following the

incident, the certificate of probable cause (PC) and J&S from the D.H. conviction, and the information, PC certificate, bail request, and J&S from the Y.C. conviction.

Stearns filed a written objection to the admission of the other act evidence and argued that the risk of unfair prejudice was particularly high given the nature of the convictions and these acts could not be considered a plan because they lacked sufficiently "complex" similarities, as required by case law. He averred admission of other act evidence based on otherwise "superficial" similarities would essentially "swallow the rule" prohibiting admission of propensity evidence. Stearns contended that any similarities between the past incidents and the circumstances of Williams' death were too generic and the State had ignored several dissimilarities, which weighed against demonstration of a plan and instead could only establish propensity.

The State responded that Stearns was attempting to raise the legal standard for admission under ER 404(b) by arguing that *complex* similarities were required. The State claimed all that was required under case law was "substantial similarity." Stearns countered with a line of cases he asserted indicate that "[p]rior bad acts involving sex offenses are particularly prejudicial" and "[t]he danger is that the defendant will be found guilty not on the strength of the evidence supporting the current charge, but because of the jury's overreliance on past acts as evidence of his character and propensities." *See State v. Sutherby*, 165 Wn.2d 870, 886, 204 P.3d 916 (2009); *State v. Coe*, 101 Wn.2d 772, 780-81, 684 P.2d 668 (1984); *State v. Slocum*, 183 Wn. App. 438, 442, 333 P.3d 541 (2014). He also refuted the assertion that the past cases were as similar to the circumstances of Williams'

death as the State claimed and highlighted the critical factual differences. Stearns further noted that the case law requires evidence that suggests actual planning, not just acts that were comparable.

The court ultimately admitted evidence of Stearns' convictions stemming from the 1981 and 1989 crimes against B.G. and D.H., respectively, but declined to admit anything related to the 1999 offense against Y.C. As to the two earlier convictions, the court ruled that the underlying facts were supported by a preponderance of evidence based on the documentation the State provided, the other acts evidence showed a common scheme or plan, and it was relevant "to prove an element of the crime." In addressing the latter point, the third step of the assessment under ER 404(b), the trial court held that the element the State sought to prove was forcible compulsion in the rape allegations underlying the felony murder charge. The trial court determined this last aspect of the analysis carried "a dual purpose . . . It also rebuts . . . the defense of consent." The judge noted that this was "critical" to the court's ruling.

The fourth step of the admissibility analysis requires weighing the probative value against the prejudicial effect. Noting that "there is absolutely a prejudicial effect here," the judge said she would have been reluctant to admit the past incidents in the absence of a defense of consent. The court reasoned that, in light of the consent defense, the other act evidence had significant probative value. The ruling was intended to allow the State to refute claims from the defense that any sexual contact that occurred between Williams and Stearns prior to her death was consensual. Rebutting this claim was key to the State's case as the felony murder

charge rested on a theory that Stearns murdered Williams during the course of raping her "and in furtherance of said crime and in the immediate flight therefrom, and with premeditated intent to cause the death of another person." The court concluded, "I think it's clear that the probative value in the 1981 case [involving B.G.], and in the 1989 case [with D.H.] far outweigh the prejudicial effect assuming there will be a limiting instruction given to the jury," and found that the B.G. and D.H. convictions did constitute a common plan or scheme because the methods Stearns used to subdue the women was similar; blows to the head and strangulation, followed with "vaginal or attempted vaginal assaults," and evidence of robbery. In passing, the court also noted the evidence was probative of opportunity and access; the other acts had occurred in the same neighborhood as Williams' murder and Stearns had been living in that neighborhood on and off at the time of all the incidents.

### C. Trial Court Misapplied the Law

The trial court's interpretation of the case law on ER 404(b) evidence of a common scheme or plan was erroneous as the B.G. and D.H. convictions lack sufficient similarities to Williams' murder. The record suggests both a misguided analysis of how these broad resemblances demonstrate a common scheme or plan and improper considerations as to prejudice.

"Over the last 20 years, the Washington Supreme Court has unquestionably enlarged the evidence of a defendant's prior bad acts that may be admitted as proof of a plan for committing crime sufficiently similar to the crime presently charged to justify admission under ER 404(b)." *Slocum*, 183 Wn. App. at 449.

- 10 -

While the State sought to admit evidence of three of Stearns' prior convictions, the court excluded one of them and the State does not appeal that ruling. Accordingly, we analyze only the evidence of the B.G. and D.H. convictions that was presented to the jury in the trial for Williams' murder.

In support of its motion to admit evidence of the B.G. conviction, the State offered the *Alford* plea Stearns entered in that case and B.G.'s statement that she and the SPD officer who took her report both signed. B.G., a White woman who was 20 years old at the time of the assault, told the officer that Stearns had initially gained entry into her apartment around midnight by telling her that "someone was after him" and asking for shelter. B.G. explained that she allowed Stearns inside because she knew him through her brother. Shortly after, he struck her over the head with a whiskey bottle he had brought with him. After a struggle, he choked B.G. until she stopped resisting and then vaginally raped her three times. Stearns left the apartment and then returned briefly before again departing, after which B.G. noticed that he had taken her TV. B.G. later testified to these same events at the trial in the instant case.

As to the D.H. conviction, the State offered the information and PC certificate filed by the prosecution to initiate the case, as well as the J&S entered after trial. D.H., a White woman, was 41 years old at the time of the assault. The PC certificate, prepared and offered under penalty of perjury by Baird, the same DPA who filed the charge on Williams' murder, stated that D.H. passed Stearns, who was laying in the gutter, as she walked home from work at around 5 p.m. After she had attempted to avoid him by walking in the middle of the street, Stearns ran

up behind her, grabbed her by the hair, and hit her in the face.[2] Stearns forced D.H. to her knees, seized her by the throat, struggled with her in the street, and attempted to insert his fingers into her vagina. At one point, Stearns waved a passing car to go around them and told the driver that D.H. was his fiancée. After he wrestled D.H. to the sidewalk, Stearns attempted to force her to a nearby park,[3] but the attack was interrupted by Stearns' brother. When Stearns was later arrested, some of D.H.'s property was found in his possession, assumed to have been taken from her during the struggle. Like B.G., D.H. testified to these facts at trial in the Williams case. These documents, and the proffered testimony of B.G. and D.H., easily satisfy the State's burden at the first step of the ER 404(b) analysis to establish by a preponderance that the other acts occurred. Once that threshold showing is made, the court must consider the purpose for which the evidence was offered, whether it was relevant to prove an element of the charged crime, and if it is ultimately more prejudicial than probative. *Gresham*, 173 Wn.2d at 421.

There are two general categories of ER 404(b) cases relied on by the parties: sexual violence against adults and sexual assault of children,[4] both of

---

[2] No weapon is described in the record.

[3] In his opposition to the State's motion to admit this evidence, Stearns asserts that this was not Lavizzo Park where Williams was found. While the assertion that Stearns proceeded with D.H. "toward a nearby park" is set out in the PC certificate in that case, his intended destination on that date was never established as the assault was interrupted.

[4] The child sex offense cases offered in briefing are sufficiently factually distinct as to be inapposite here. The victims in those cases obviously fell within a specific age range and there was usually some prior relationship between the perpetrator and the victim, whether within the family, or as a neighbor or family friend. *Gresham*, 173 Wn.2d at 413 (victims included perpetrators' granddaughters, nieces, and children of close friends); *Slocum*, 183 Wn. App at 444, 445 (victims included a step-granddaughter, stepdaughter, and daughter-in-law).

Further, this line of cases all involved grooming conduct, which is markedly different than the acts alleged here. As such, any analogies are tenuous. For example, in cases addressing grooming of a victim, the overall duration of the plan and associated crimes is generally longer, as the perpetrator prepared the victims for abuse over weeks or months and the abuse sometimes lasted for years. *See DeVincentis*, 150 Wn.2d at 13 (victim was groomed for several months);

which seem to favor Stearns' position that the admitted "evidence of prior sexual assaults . . . were not markedly similar to the crime charged." The latter type of cases offered in briefing, child sex offenses, are sufficiently factually distinct as to be inapposite here, thus, we do not consider them further on this question.[5] However, the cases involving sexual violence against adults are more factually similar to Stearns' past activities and those alleged in this case, though they show a greater degree of specificity than the plan the State attributed to Stearns. As Stearns noted in his opening brief, "The plan need not be complex, but the prior acts must show that 'an individual devises a plan and uses it repeatedly'" (quoting *Lough*, 125 Wn.2d at 855).

In *State v. Lough*, the defendant challenged the ER 404(b) admission of victim testimony that he "had previously drugged and raped four other women, while in relationships with them." 125 Wn.2d at 851-52. Our Supreme Court held that admission was proper, in part because it was "admitted to show that he committed the charged offense pursuant to the same design he used in committing the other four acts of misconduct." *Id.* at 861. The specific facts of the case made admission of Lough's "prior conduct particularly necessary." *Id.* at 863. Lough's chosen method rendered the victims "unconscious or unable to clearly remember everything that happened, the evidence of many prior similar episodes to prove a

---

*Slocum* 183 Wn. App. at 443 (abuse occurred over ten years); *State v. Gantt*, 29 Wn. App. 2d 427, 449, 540 P.3d 845 (abuse of defendant's daughters lasted several years, beginning with touching over victims' clothes in shared bed and escalating to penetration), *review denied*, 3 Wn.3d 1002 (2024). The plans in these cases increased in intensity over time and were intended to break down the inhibition of victims and isolate them. *See Slocum*, 183 Wn. App. at 443 (efforts taken to isolate past victim and over time break down inhibitions were identical to present victim); *State v. Kennealy*, 151 Wn. App. 861, 870-74, 214 P.3d 200 (2009) (victims first invited to apartment for popsicles and abused on later visits).

[5] *See DeVincentis*, 150 Wn.2d 11; *Slocum*, 183 Wn. App. 438; *Gresham*, 173 Wn.2d 405.

plan was necessary and probative of the facts of the charged crime." *Id.* at 864. Lough's past acts not only had several clear parallels to his then-pending offense, but the nature of the past acts themselves also made their admission vital to prove the charges.

*State v. Williams* addressed a defense challenge to victim testimony related to a prior conviction for rape that was admitted pursuant to ER 404(b). 156 Wn. App. at 491. Notably, the testimony about the past rape was "relevant to the element of forcible compulsion" and to rebut the consent defense raised by the defendant, the same defense raised by Stearns here. *Id.* On appeal, the evidentiary ruling was upheld because "the admission was relevant and appropriate" in light of that defense. *Id.* The court held that the past rape conviction evidenced a plan to target similar victims, female drug users of a comparable age, "and a similar method of attack." *Id.* Williams promised the victims drugs, attacked them from behind, strangled them by placing his forearm across their throat, and ultimately each victim was "strangled into unconsciousness during the rape." *Id.* *Williams* is closest to the facts presented here, but shows a greater degree of specificity than is present in Stearns' case.

The State offers *State v. Yates*; however, this case does not directly analyze admissibility of other act evidence under ER 404(b), but rather the sufficiency of a jury instruction that defined "common scheme or plan." 161 Wn.2d 714, 753, 168 P.3d 359 (2007), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018). As such, it is of limited utility here. However, the challenged instruction in *Yates* "relied on the two alternative definitions of 'common scheme

or plan' that this court embraced in [*Lough*] for purposes of defining 'common scheme or plan' under ER 404(b)." *Id.* at 750. The trial court in *Yates* properly admitted evidence relating to past murders to prove that the two charged murders were part of a common scheme or plan. *Id.* at 753. Yates lured "white or light-skinned" sex workers into his vehicle and "kill[ed] them by shooting them in the head with a small caliber handgun." *Id.* He would "encas[e] their heads in plastic bags to ensure their deaths" and to try to contain their blood. *Id.* Yates then stripped them to find any hidden money and "transport[ed] them to dump sites in secluded areas." *Id.* Our Supreme Court held that "'any rational trier of fact could have found" that the charged murders "were 'part of a common scheme or plan'" based on the similarities between past murders and the charged offenses. *Id.* (quoting *State v. Brown*, 132 Wn.2d 529, 607, 940 P.2d 546 (1997)). There were clear "profiles" of the victims in both *Williams* and *Yates* and the crimes featured distinctive acts or signatures, such that a clear pattern or plan emerged.

At oral argument before this court, the parties also disputed the import of *State v. Brown*. There, the Supreme Court held that the trial court did not err when it admitted evidence of Brown's prior sexual assault of S.S. as res gestae and because it was "probative of [Brown's] motive, intent, preparation and plan to kidnap, rob, and murder" H.W., the named victim in the case then before the court. *Brown,* 132 Wn.2d at 573. The evidence also rebutted Brown's defense that the sexual contact with H.W. before her death was consensual. *Id.* at 574. S.S. and H.W. had been assaulted in a "markedly similar manner," both "bound with the same pair of handcuffs, gagged, and had their pubic hair shaved" prior to each

rape. *Id.* These facts "made it more probable" that any sexual contact between Brown and the murdered woman "was by forcible compulsion, and less probable it was consensual." *Id.*

### 1. Common Scheme or Plan

With this jurisprudence in mind, we turn to the trial court's ruling that evidence of the B.G. and D.H. convictions established a common scheme or plan such that it was admissible in the trial on Williams' murder. The defense opposition to the ER 404(b) motion noted that the three "prior bad acts" the State sought to introduce at trial "spann[ed] a period of 20 years," with Williams' death occurring at the end of that timeframe.[6] Stearns emphasized that there was no common underlying relationship between him and the victims: B.G. was a younger White woman known to him who testified at trial that she had rebuffed advances from him prior to the assault in 1981, D.H. was a middle-aged stranger, and there was no evidence of any history between Stearns and Williams, a Black woman who was 33 years old when she was killed, apart from the evidence of recent sexual contact. Stearns approached each of the women in different ways; he gained entrance to B.G.'s apartment by relying on a ruse and their familiarity through her brother, he surprised D.H. on the street with a sudden attack, and he is speculated to have approached Williams either for her services or by an assault. Each of the incidents occurred at different times of the day and in different locations; B.G.'s

---

[6] This window of time included the 1999 incident that was excluded by the trial court and, therefore, it is not part of the analysis here. However, given that Williams' death occurred in 1998, the timeframe is still roughly the same.

assault occurred at her residence in the middle of the night, D.H.'s openly in the street in the evening, and Williams' in a public park, likely in the early morning.

The B.G. and D.H. cases are sufficiently distinct from each other, and from the facts of the case involving Williams, such that they exceed the scope of common scheme or plan as established by case law. In *Lough*, *Yates,* and *Williams*, each defendant's initial contact with the various victims showed much greater consistency. Lough's victims had all been involved in dating relationships with him when he drugged and raped them. *Lough,* 125 Wn.2d at 849-52. Yates' victims were all White or light-skinned sex workers who he lured into his vehicle. *Yates,* 161 Wn.2d at 753. Finally, Division Three of this court described Williams' victims as "women of a similar age, involved with drugs" who were attacked from behind after Williams promised them drugs. *Williams,* 156 Wn. App. at 491. The victims associated with Stearns are of different ages and races with lifestyles significantly dissimilar from each other. B.G. was 20 years old, White, and unemployed. D.H. was 41 years old, White, and worked downtown at an insurance company. Williams was Black, 33 years old, and a sex worker. Further, none of the women associated with Stearns in these cases were approached in the same way as any other and their respective relationships with Stearns were markedly distinct. B.G. knew Stearns, who was 19 years old at the time of the attack, through her brother and testified that she had rejected Stearns' advances in the past. D.H. was a stranger and over a decade older than Stearns when he assaulted her. The record is silent on any possible prior relationship between Stearns and Williams other than a sexual encounter shortly before her death.

The State has repeatedly emphasized in the trial court and on appeal that Stearns used a "similar approach" with B.G., D.H., and Williams and emphasized his assaultive conduct. At oral argument before this court, the State clarified that it used the term "approach," to refer to the fact that he struck the women by surprise.[7] The tragic reality, however, is that many sexual assaults involve striking, restraining, and choking the victim.[8] Indeed, several of the cases cited as authority by the parties here detail the striking and choking of the various victims of defendants Williams, Yates, Brown and Lough. The fact that assaultive behavior was used in Stearns' crimes against B.G. and D.H., and that Williams had also been struck and strangled, without more, does not establish a common scheme or plan under the controlling case law.

For example, in *Brown*, which the State cites in support of its contention that the other act evidence was properly admitted to rebut Stearns' defense of consent, Brown bound both S.S. and H.W. with the same handcuffs, gagged, and shaved them before eventually raping them and slitting their throats. 132 Wn.2d at 573-74. Our Supreme Court held that these common facts rendered the assault of S.S. "markedly similar" to Brown's attack on H.W. only two days prior. *Id.* at 574. Williams promised drugs to all of the victims in his cases then choked them from behind in the same manner, and ultimately "strangled [them] to unconsciousness during the rape[s]." *Williams,* 156 Wn. App. at 491. The court in *Yates* relied on the standard articulated in *Brown* to conclude that the State had presented

---

[7] Wash. Ct. of Appeals oral arg., *supra,* at 8 min., 29 sec.
[8] Stearns reiterated this point during argument before this court, noting that; "Unfortunately, physical force is inherent in the vast majority of sexual assaults. . ." *Id.* at 3 min, 21 sec.

sufficient evidence of a common scheme or plan because it had shown that Yates lured "[W]hite or light-skinned women" who were sex workers into his vehicle, negotiated for sex acts, shot them in the head with a small caliber firearm, "encase[ed] their heads in plastic bags to ensure their deaths and to prevent their blood from saturating the vehicle," undressed them and took any money he found, and transported the bodies to "dump sites in secluded areas." 161 Wn.2d at 753. Finally, in *Lough*, the court found the testimony of four women, unknown to each other, that Lough had drugged[9] and anally raped them, was admissible as evidence of a common scheme or plan in his trial for attempted rape in the second degree, indecent liberties, and burglary in the first degree where the victim, P.A., also asserted that Lough drugged and assaulted her.[10] 125 Wn.2d at 849-52.

Here, Stearns, whose prior advances had been rejected, gained entry to B.G.'s apartment in the middle of the night through their familiarity via her brother and with a story that someone was after him, and ultimately vaginally raped her three times. He later attacked D.H., an older stranger, in the middle of the street during the evening commute and attempted to digitally penetrate her. Finally, the State alleged that Stearns bludgeoned and strangled Williams pursuant to a vaginal rape in the early morning hours in a public park. As Stearns noted in briefing and oral argument before this court, the jurisprudence requires that the evidence must be of "markedly similar acts [of misconduct] against similar victims under similar circumstances," in order to be admissible under ER 404(b) as

---

[9] Three of the women testified that Lough drugged them with a drink, and the fourth stated that he gave her what he described as a pain pill. *Lough,* 125 Wn.2d at 850-52.
[10] P.A. and another woman also testified to finding the clothes they had been wearing neatly folded nearby upon awaking. *Id.* at 851.

evidence of a common scheme or plan.[11] The facts here do not support admission on this basis.

The similarities between the cases involving B.G., D.H., and Williams are simply too tenuous to constitute a common scheme or plan. The trial court abused its discretion in ruling that the other act evidence was admissible under ER 404(b) for that purpose.

### 2. Evidence of Lack of Consent

The trial court also admitted evidence of the B.G. and D.H. convictions as probative of the forcible compulsion element of the rape of Williams or, alternately, to rebut Stearns' defense that any sexual contact with Williams prior to her death was consensual. The State relies heavily on *Brown*, which did admit the other act evidence, among other reasons, to rebut Brown's assertion that the sexual contact with the deceased victim H.W. was consensual. 132 Wn.2d at 574. The trial court here expressly noted that, particularly in light of the prejudice that would come from admitting evidence of the B.G. and D.H. convictions, in the absence of Stearns' consent defense, it likely would have excluded the evidence. However, as Stearns notes, other act evidence may not be admitted to show that the accused has a propensity to commit crimes, a criminal disposition, or bad character. But *Brown*, *Lough*, and the other controlling cases on ER 404(b) evidence all clearly establish that even if the other acts are admissible for some purpose that is not propensity, the evidence may still be inadmissible if the prejudice outweighs the probative

---

[11] Wash. Ct. of Appeals oral arg., *supra,* at 4 min., 40 sec.

value. *See Brown*, 132 Wn.2d at 571; *Lough*, 125 Wn.2d at 862; *Slocum*, 183 Wn. App. at 456; *Saltarelli*, 98 Wn.2d at 361.

### 3. Improper Considerations as to Prejudice

Even if it may be admitted for some permissible purpose under ER 404(b), the evidence may still be excluded if its probative value is outweighed by potential prejudice. In order to engage in this fourth step of the analysis under the rule, trial courts must effectively apply ER 403, which reads in relevant part, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

The trial court also abused its discretion in this final step of its analysis because its determination of prejudice was based on untenable grounds. The judge stated the following when making the ruling:

> I disagree with defense that juries do not listen to limiting instructions. In fact, *I think juries are exceptionally careful in King County. I have sat as a visiting judge in other counties, and, frankly, I think we have a very fair population or they are not big fans of the police. They are not big fans of the prosecutor's office, and they are quick to hold the State accountable*, and I also believe that they do follow the law when they are given a limiting instruction.

(Emphasis added.)

The State argued this court should disregard that statement as the trial judge had already ruled on the admissibility of the other act evidence, but the record establishes that this *was* part of the court's ruling. The judge was rejecting the defense argument against admission that the prejudice from this evidence could not be tempered with a limiting instruction; effectively, that the ER 403

standard prevented its admission. In doing so, she relied on her own anecdotal experience based on sitting "as a visiting judge in other counties" to conclude that "juries are exceptionally careful in King County." There is nothing in our state's evidence rules or jurisprudence that allows the application of a county-by-county standard with regard to the admission of prejudicial evidence. This is a plainly improper consideration with regard to the final factor of the ER 404(b) analysis, which ultimately resulted in the ruling to admit the challenged evidence. This was an untenable ruling that rested on untenable grounds.

### D. Harmless Error

If we determine that the trial court erred as to an evidentiary ruling, we then consider whether its admission was harmless. "Erroneous admission of evidence in violation of ER 404(b) is analyzed under the nonconstitutional harmless error standard—that is, we ask whether there is a reasonable probability that, without the error, the 'outcome of the trial would have been materially affected.'" *State v. Gower*, 179 Wn.2d 851, 854-55, 321 P.3d 1178 (2014) (internal quotation marks omitted) (quoting *State v. Smith*, 160 Wn.2d 772, 780, 725 P.2d 951 (1986)). "As we pointed out in *Gresham*, the potential for prejudice from admitting prior acts is 'at its highest' in sex offense cases." *Id.* at 857 (internal quotation marks omitted) (quoting *Gresham*, 173 Wn.2d at 433). In *Gresham*, the court noted that admission of "highly prejudicial evidence" created "a reasonable probability" that the jury's verdict was "materially affected." 173 Wn.2d at 433-34.

In Stearns' prosecution here, the State made significant use of the evidence admitted under ER 404(b), and Baird, the DPA originally assigned to the case,

- 22 -

even consulted with the appellate unit of the prosecutor's office to determine whether and how the other act evidence could be used in the prosecution of Williams' murder. In fact, Baird specifically testified in a pretrial hearing on the defense motion to dismiss for improper preaccusatorial delay that he "didn't think [the case against Stearns] should be filed without a consideration of the admissibility of other acts." The DPA who took the case over from Baird and tried it in 2020 first mentioned the B.G. and D.H. convictions in opening statements, repeatedly returning to those facts throughout the State's initial presentation of its case to the jury. Both B.G. and D.H. testified at trial and were not cross-examined by the defense. The DPA then referenced their testimony numerous times in closing, often in conjunction with detailed descriptions of Williams' injuries, which compounded the possibility of prejudice and risk of a material effect on the verdict. A limiting instruction was given to the jury when the other act evidence was introduced and we presume that a jury follow the instructions of the court. *See State v. Weaver,* 198 Wn.2d 459, 467, 496 P.3d 1138 (2021). However, during his testimony on the pretrial motion to dismiss, Baird effectively conceded the comparative weakness of the State's case without the other act evidence when he described how that factored into his decision to finally file charges. It is also noteworthy that Stearns' previous trial ended in a hung jury. These facts, and the entirety of the record before us, establish a reasonable probability that the court's error in admitting evidence of the B.G. and D.H. convictions under ER 404(b) materially affected the outcome of Stearns' trial. Accordingly, reversal is required.

While the ER 404(b) issue is independently dispositive, we reach the remaining assignments of error as they are capable of repetition in the event that the State elects to retry Stearns.

II.     Judge's Comments during Issuance of Jury Instructions

Stearns alleges reversal is required due to irregularities in the trial judge's instruction of the jury.  He argues his right to fair trial was violated when, in two separate instances, the judge expressly informed jurors they could "tune out" her reading of the jury instructions.  The challenged comments are first:

> As soon as I have everybody I'm going to instruct you on the law.  You will each have a copy of the instructions on the law.  You can read along with me.  *You can tune me out.*  You can do a combo.  You are going to be able to keep those instructions when you go back to begin your deliberations.  So that will be the first order in the morning.

(Emphasis added.)  And later:

>         THE COURT: Good morning.  Welcome back and please be seated.  You each have instructions on your individual seat.  I'm going to read them to you out loud.  You may follow along with me.  *You may tune me out.*  It just depends on how you learn.  You may do a combo.  May be able to take these back once you being your deliberations.  If I say something different than what's in the written instructions, follow the written instructions unless there is an obvious typo.  If there is a typo, I will let you know.  Take your pen, and I will tell you what the interlineation should be.

(Emphasis added.)

As a preliminary matter, the State argues this issue is not preserved for appeal.  RAP 2.5 allows a reviewing court to consider a matter for the first time on appeal if it implicates a constitutional right and the error is manifest.  *State v. Kirkman*, 159 Wn.2d 918, 934-35, 155 P.3d 125 (2007).  "'Manifest' in RAP

2.5(a)(3) requires a showing of actual prejudice." *Id.* at 935. A party seeking review of an issue under the manifest constitutional error standard must make a "plausible showing . . . that the asserted error had practical and identifiable consequences in the trial of the case." *State v. Lynn*, 67 Wn. App. 339, 345, 835 P.2d 251 (1992). Stearns properly presented this challenge under RAP 2.5. Inadequate instruction of the jury, or its omission entirely, is an error of constitutional magnitude because due process requires instruction on "the presumption of innocence and the right to have the State prove every element of the offense beyond a reasonable doubt." *State v. Ackerman*, 11 Wn. App. 2d 304, 309-310, 453 P.3d 749 (2019) (quoting *State v. Johnson*, 100 Wn.2d 607, 614, 674 P.2d 145 (1983), *overruled on other grounds by State v. Bergeron*, 105 Wn.2d 1, 711 P.2d 1000 (1985)). Here, Stearns contends that because the judge said jurors could tune her out, "there is no way to ensure that each juror was instructed on applicable law." This necessarily calls into question whether the jury here properly decided this case, presenting a "practical and identifiable consequence" in terms of Stearns' due process rights. Thus, we consider this assignment of error.

"The court shall read the instructions to the jury." CrR 6.15(d). This court presumes the jury follows its instructions. *Weaver,* 198 Wn.2d at 467. "But that rule will not cure a trial court's failure to support a written instruction with an oral recitation; a trial court's failure to recite an instruction to the jury is analogous to giving an erroneous, ambiguous, or misleading instruction." *State v. Sanchez*, 122 Wn. App. 579, 590, 94 P.3d 384 (2004). Nor will a reviewing court "presume the

jury reads written instructions alone or that the jury was sufficiently literate to comprehend the instructions accurately." *Id.*

The case law Stearns relies on for this claimed error is distinguishable because it addresses instances where the judge declined to read the instructions at all. *See People of the Territory of Guam v. Marquez*, 963 F.2d 1311 (9th Cir. 1992); *Sanchez*, 122 Wn. App. 589; *United States v. Becerra*, 939 F.3d 995 (9th Cir. 2019). That is simply not what happened here. *Becerra* is informative, however, as it explains that

> even if a jury is comprised of an unusually educated cross-section of the community, many of us at times succumb to the temptation to glaze over a long paragraph of text or flip over a few pages of a lengthy stack of papers. When the instructions are read orally, tonal inflection can make the content of the instructions more accessible, as well as discourage the "tuning out" common when reading dense material. Oral instruction in the formal courtroom setting thus assures that jurors are exposed to the substance of the essential instructions by at least one sensual route.

939 F.3d at 1001. The court went on to reinforce that

> [j]ury instructions are not the judicial equivalent of a car manual or a cookbook. When an enrobed judge orally charges the jury, the jurors are impressed with the fact that they have been entrusted with the power to decide the defendant's fate.

*Id.*

Though the particular comments by the judge here are indisputably ill-advised and should be avoided, they do not rise to the level of reversible error. Considered in context, and coupled with the fact that the jury instructions *were* read, Stearns fails to establish reversible error on this issue.

III.     Prosecutorial Misconduct

Finally, Stearns asserts the State engaged in prosecutorial misconduct in closing arguments "when, over defense objection, [the DPA] argued that, unlike Mr. Stearns, the jurors cared about Ms. Williams." He contends that this comment improperly suggested to the jury that acquittal would mean the "jurors did not value Ms. Williams life." In reply, the State avers that these statements were permissible inferences from the record and "there is no plausible chance that the jury would have acquitted in their absence." We agree that the challenged statements were improper, however Stearns has not established prejudice within the framework of the trial as a whole such that the misconduct requires reversal.

In a prosecutorial misconduct claim, the defendant has the burden to show that the challenged conduct was improper and prejudicial in the context of the entire record. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). To demonstrate prejudice, Stearns must establish that there exists a substantial likelihood that the misconduct affected the jury's verdict. *Id.* at 443. "A prosecuting attorney represents the people and presumptively acts with impartiality in the interest of justice." *Id.* "Defendants are among the people the prosecutor represents. The prosecutor owes a duty to defendants to see that their rights to a constitutionally fair trial are not violated." *State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). A prosecutor is required to "seek convictions based only on probative evidence and sound reason." *State v. Casteñeda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74 (1991).

"[A] prosecutor engages in misconduct when making an argument that appeals to jurors' fear and repudiation of criminal groups or invokes racial, ethnic, or religious prejudice as a reason to convict." *State v. Perez-Mejia*, 134 Wn. App. 907, 916, 143 P.3d 838 (2006). "[I]nflammatory remarks, incitements to vengeance, exhortations to join a war against crime or drugs, or appeals to prejudice or patriotism are forbidden." *Id.* "A prosecutor may not suggest that evidence not presented at trial provides additional grounds for finding a defendant guilty." *State v. Russell*, 125 Wn.2d 24, 87, 882 P.2d 747 (1994). "References to evidence outside of the record and bald appeals to passion and prejudice constitute misconduct." *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). "Allegedly improper arguments should be reviewed in the context of the total argument, the issues in the case, the evidence addressed in the argument and the instructions given." *Russell*, 125 Wn.2d at 85-86.

Here Stearns asserts the following comments by the prosecutor in initial closing were an improper appeal to emotion and not relevant to the elements of the charged offense:

> [State:] These are extraordinary times. Unlike the defendant who clearly did not care at all about Ms. Williams. Didn't even consider her to exist. We know you care. We know you as jurors—
>
> [Defense]: Objection, your Honor. Improper argument.
>
> THE COURT: It's overruled.
>
> [State]: We know because you're seated here during a pandemic wearing masks, and you are honoring your duty as a juror. Once I am done talking to you, at the end of the day today, and you start your deliberations the State is confident that you will return a verdict of guilty of murder in the first degree.

Stearns notes that "[t]his argument served no other purpose but to inflame the passion and prejudice of the jury." We agree that the DPA's argument here has nothing to do with the evidence in the case and was improper.

However, despite the fact that the comment could fairly be characterized as an improper appeal to passion, Stearns directly responded to it in closing argument in such a way as to remind the jurors to disregard that invitation to decide the case on improper grounds. Further, defense counsel went on to actually exploit this aspect of the State's closing and expressly argued that the DPA resorted to such tactics due to the lack of evidence, stating,

> And if you think about it much of the State's case is actually based on emotional [sic]. Saying she was left there like a piece of trash. It was a cold, wet park. That is an appeal to emotion. Right? Because they have to prove that it was John Stearns who did it. Not somebody else. So saying he left her there like a piece of trash. That's not an appeal to facts and law and logic. That is appealing to emotion, and it's because the science doesn't prove their case, and the witnesses don't prove their case, and all that's left is the emotion. But when you follow the law you will see that the prior convictions do not unequivocally prove guilt.

Considering the State's improper argument in the context of the trial as a whole, including Stearns' effective response in closing, Stearns cannot meet his burden as to prejudice on this claim.

Reversed and remanded.

WE CONCUR:

- 29 -